M. P. DOULLUT & SON v. GENERAL CONTRACT CO., Inc.

(Circuit Court of Appeals, Fifth Circuit. March 8, 1915.)

No. 2697.

TOWAGE ☞14—CONTRACT—ASSUMPTION OF RISK.

Evidence considered, in relation to the making of a contract by respondents to tow a raft of piles on the Mississippi River for libelant, and *held* to establish an agreement that, on account of the bad condition of the piles, many of which would not float, and for which reason respondents had refused to take them, libelant would assume the risk of their loss.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 28; Dec. Dig. ☞14.]

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in admiralty by the General Contract Company, Incorporated, against M. P. Doullut and Paul Doullut, partners as M. P. Doullut & Son. Decree for libelant, and respondents appeal. Reversed.

The following statement of the case is taken from the briefs of counsel:

The General Contract Company, Incorporated, appellee herein, brought this libel in personam against M. P. Doullut and Paul Doullut, doing business under the name of M. P. Doullut & Son, a commercial partnership, to recover the sum of $1,576.31, being the damages sustained by said libelant through the failure of the respondents to carry out a contract of towage. The libel recites that on March 2, 1910, the libelant, through their own agent and manager, Louis Lesassier, entered into a verbal contract or agreement with M. P. Doullut, representing the defendants, whereby the latter undertook to take some 263 piles, at a point in the Mississippi river, near the entrance to Lake Borgne Canal, and tow them and safely deliver them at another point in the Mississippi, known as Ft. St. Philip, where the libelant was engaged in some construction work for the United States government. The libel further recites that on the next morning, March 3, 1910, the respondents accepted and took charge of the said piles, and by means of their tug, the Independent, proceeded to tow them down the river. It is then charged that, through various acts of negligence of said respondents and of their agents, caused by improper management and insufficient crew and means, the entire raft of 263 piles was completely and permanently lost. The libelant then charges that through said breach of contract it lost not only the value of said piles, but was subjected to various items of expenses, including cost of new piles, new hauling, and freight charges, keeper's fees, demurrage dues claimed by the government for delay, etc., all itemized in the libel, which, together with new towage charges on the second delivery, make a total of $1,576.31 claimed by libelant.

The defendants, in answer to the libel, "admit that they entered into the contract averred in plaintiff's libel, except it was specially agreed that, as such piles were in bad condition and would not float, and were largely 'sinkers,' the said Louis Lesassier, agent for libelant, and said defendants especially agreed that the libelant company, and not defendants, would assume all liability and risk for the sinking of said piles while being towed. * * * Defendants deny that there were any acts of negligence of either commission or omission, such as charged by libelants; * * * but aver that the sole and only reason for the loss of said piles was the unseaworthy and sinking character of said piles, which libelant was fully aware of before said voyage began, and which risk the libelant expressly assumed." The defendants further averred that the libelant company was indebted to defendants for $484 for various trips in towing cement, lumber, paying wharfage, and the hire of various barges, and the towing of pile-drivers, and also barges with piles, and that only when it was repeatedly pressed to comply with its unconditional obligation to pay defendants this $484, was there a claim asserted for the loss of said piles over one year after said alleged cause of action arose, and then only for about one-half the sum demanded in the present libel. It is further substantially averred that the libelant, being pressed to pay its admitted liability, and being threatened with suit, has brought this libel to hamper and delay our recovery.

A cross-libel was filed for above $484. The answer to this cross-libel admits owing defendants the sum of $95, but denies owing $484.

The judgment of the lower court was in favor of libelant for the value of the piles, $571.62, and $125 for the salary of an engineer inspector, who, it is claimed, the libelant had to pay on account of its delay in finishing the work at Ft. St. Philip. On the cross-libel the defendants were given judgment for $384. From this judgment the defendants have prosecuted an appeal to this court.

James Wilkinson, of New Orleans, La., for appellants.
Armand Romain, of New Orleans, La., for appellee.

Before PARDEE and WALKER, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge. The principal and controlling question in the present case is whether, as asserted in the answer to the libel, Mr. Lesassier, as agent of the appellee, and the appellants, agreed that the appellee would assume the liability and risk attending the towing of the piles from the entrance to the Lake Borgne Canal down the river to Ft. St. Philip. Touching the question thus presented it is impossible to reconcile the testimony of the two witnesses, Captain Doullut, the senior partner of the firm of Doullut & Son, and Mr. Lesassier. The former affirms unequivocally that such an agreement was made, while Mr. Lesassier with equal positiveness denies it. In this connection the record discloses, briefly stated, the following facts:

When the piles were delivered by Captain Thomas, at the entrance of the canal, to the tug Independent, they contained an unusual number of sinkers and were in bad condition for towing. On cross-examination the following question was propounded to Captain Thomas, a witness for the appellee:

"When they (meaning piles) arrived in the river, were they in a floating condition, or were some of them in a sinking condition?"

The witness answered:

"Most of them were floating, but some of them were sinking; there were some sinkers in every tow."

This question was then propounded:

"Didn't you tell me personally, on a number of occasions, that the various piles were in such a sinking condition, and were in such a bad condition, that you telephoned up to Captain Doullut the condition of the piles, and advised him not to take them?"

The witness replied:

"Yes, sir; I told him the condition of the piles was bad, and I told his captain that he ought to fix them up. I told the captain to go down below the coal chute and fix them up."

Captain George, of the Independent, acting for the appellants, testified that the piles "were in a very bad condition in the canal, but after I pulled them out in the river they showed up in such condition that I was afraid to undertake towing them." After tying the piles up with the tug at the coal chute, Captain George also notified Captain Doullut of the condition of the raft, and shortly thereafter, upon receiving instructions "to go ahead," he proceeded down the river with the raft in tow. After Captain Doullut received the telephone message from Captain Thomas, and being aware of the danger incident to towing piles on the river, he notified, according to his testimony, Mr. Lesassier that he could not tow the piling. He testified as follows:

"Q. When you were so notified, what did you do? A. I notified Mr. Lesassier before my pilot or my tug went down to Lake Borgne. The moment that the piling reached the locks, before coming through, the operator of the locks notified me, and also a captain, who I think was Thomas, that those pilings were in a bad condition, not only sunken, but were all mixed up. I then

notified Mr. Lesassier to look for another tug, that I wasn't going to tow his piling down the river. Mr. Lesassier was sick—that is, he told me he was sick—and he told me all right, that he would look for another tug, and that ended the matter for that day. The next morning Mr. Lesassier rang me up and told me he wanted me to help him out; that he couldn't get another tug; and then I told Mr. Lesassier it would be all at his risk—that I wouldn't be responsible—so he told me to go ahead. He said, 'I know you will do what you can,' and I told him I would. So I ordered the tug down, and the tug went down and pulled the piling out in the river, and, according to my captain, landed right below the canal, I judge 200 yards."

## He further testified:

"I told Mr. Lesassier that I did not want to take his piles down, and he told me he tried to get the Bisso people to take them down, and he could not, and he was sick in bed himself, and he begged me to take them down and do the best I could—that he would not hold me responsible for the piles if I lost them."

Mr. Lesassier, as will appear from the following question and answer, denied emphatically that he made such agreement with Captain Doullut:

"Q. Now respondents set up in their answer here that, when they made a contract with you to tow the first batch of piles down the river, it was agreed between you and Mr. Doullut that you would hold them blameless for the loss of those piles, because you considered them, or admitted they were, sinkers, and hard to tow down the river. Was there any agreement between you and Mr. Doullut by which you would assume all liability for the loss of these piles? A. There was not."

It may be said that, at this point, the testimony in reference to the assumption of risk by the appellee is about equally balanced. The record, however, contains written evidence sufficient to turn the scale decisively in favor of the appellants. Mr. Lesassier, having been informed, on March 3 or 4, 1910, that the raft was in bad condition and was anchored a short distance below Ft. St. Philip, secured a tug and pile driver from the appellants and proceeded down the river for the purpose of rescuing the piles. Nothing, however, was accomplished, as the piles had disappeared, and were never recovered.

Let us now consider the written evidence. It is disclosed by the testimony that the appellee was indebted to the appellants for services rendered prior and subsequent to the loss of the piles in question. The bill attached to the answer of the appellants contains several items, aggregating $474, and among them is one of $100 for towing the barge and pile driver from New Orleans to Ft. St. Philip to rescue the lost piling. Captain Doullut testified, without denial, that the bill had been presented to Mr. Lesassier and he promised to pay it. After the bill was rendered, Mr. Lesassier, for the appellee, on June 28, 1910, wrote Captain Doullut as follows:

"Dear Sir: Replying to your recent letter would say: Delays here have made money a little tight with me; however, I expect to be able to pay you about July 6, and hope to be able to do so."

The bill not having been paid, the appellants mailed another letter to the appellee, requesting payment. On August 11, 1910, the latter replied as follows:

"Ft. St. Philip, La., August 11, 1910.

"M. P. Doullut & Son, New Orleans, La.—Gentlemen: Replying to your special delivery letter of Aug. 8, forwarded to me here, would say: Delays in getting some of our work accomplished, due to errors in the government plans, have made our payments very small, especially so last month. A special agent of the Gov. having visited the job and straightened out many disputed points, we expect to be able to go ahead with our work and not be hampered. I would therefore appreciate your waiting until about Sept. 3, when your bill will be paid."

The bill still remaining unpaid, the appellants placed the claim in the hands of their attorney, Mr. Wilkinson, for collection; and on February 6, 1911, he wrote Mr. Lesassier demanding payment, and intimated bankruptcy proceedings against the appellee if it longer deferred a settlement. To this letter the attorney of the appellee, Mr. Pierson, on February 13, 1911, replied as follows:

"James Wilkinson, Esq., No. 137 Carondelet Street, City—Dear Sir: Your favor 6th inst. to the General Contracting Company at Ft. St. Philip has been referred to me for settlement of the matters with M. P. Doullut & Son referred to by you. The General Contracting Company has placed with me its claim against your clients for the sum of eight hundred and one $80/100$ dollars ($801.80) for the value of a raft of 282 pieces of piling, which were placed in charge of your clients to be towed to Ft. St. Philip for the General Contracting Company and which your clients have never delivered. The General Contracting Company stands ready to settle your clients' bill whenever they settle for the value of the raft of piles which they claim was left by them in the Mississippi river. I am authorized to say for the General Contracting Company that, if your clients are as ready and willing to pay their own obligations as the General Contracting Company is to settle its debts, there will, we hope, be no urgent necessity to invoke the bankruptcy proceedings you refer to. In behalf of the General Contracting Company I will be glad to take up the matter for settlement."

It is disclosed by the record that the letter of Mr. Pierson contained the first demand or claim made by the appellee on the appellants for the payment of the lost piling. So that, although more than 11 months had elapsed since the piles were lost, and notwithstanding the fact that the appellee had expressly in writing promised to pay the bill of the appellants, without even a suggestion in its letters of a counterclaim, the appellants were for the first time notified by Mr. Pierson's letter that they were indebted to the appellee in the sum of $801.80 for the nondelivery of the lost piles. Why this delay in the assertion of its claim by the appellee? With full knowledge of the loss of the piles, why does it agree in its letters to settle the bill of the appellants without even the suggestion of a counterclaim? It is not necessary to discuss the reasons assigned by the appellee for its failure to sooner prefer its claim against the appellants. They are altogether unsatisfactory. The letters referred to corroborate the testimony of Captain Doullut; and no other conclusion can be reached than that, when the appellants undertook to tow the piles, there was an agreement between the parties that the appellee would assume the liability and risk attending the work. A decree, therefore, in favor of the appellee was erroneous.

Little need be said in respect of the cross-bill of the appellants. They claimed $484. The appellee promised to pay the bill as rendered. There is, however, a slight mistake as to the amount. The items cor-

rectly added amount to $474, and for the last-named amount the appellants should have a decree, with legal interest from July 1, 1910.

The decree of the District Court in favor of the appellee is reversed, and its bill dismissed, and a decree is here rendered in favor of the appellants for the sum of $474, with legal interest from July 1, 1910, and costs of both courts.